UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| **MELINDA BROWN,** )<br>)<br>    **Plaintiff,** )<br>)<br>    **v.** )<br>)<br>**COMMISSIONER OF SOCIAL** )<br>**SECURITY,** *sued as Martin O'Malley,* )<br>*Commissioner of Social Security*,[1] )<br>)<br>    **Defendant.** ) | Case No. 2:23-cv-00025-SLC |

## OPINION AND ORDER

Plaintiff Melinda Brown appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB"). (ECF 1). On June 30, 2023, Brown filed her opening brief (ECF 13), to which the Commissioner timely responded (ECF 18). Brown filed a reply brief on November 16, 2023, making the matter ripe for review. (ECF 23). For the following reasons, the Commissioner's decision will be REMANDED.

## I. FACTUAL AND PROCEDURAL HISTORY

Brown applied for DIB in November 2020, alleging disability as of August 18, 2020. (ECF 10 Administrative Record ("AR") 23, 194).[2] Brown's claim was denied initially and upon reconsideration. (AR 23, 63, 72). After a timely request (AR 99-100, 117), a hearing was held on February 18, 2022, before administrative law judge ("ALJ") Marc Jones, at which Brown, who

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023, and thus, pursuant to Federal Rule of Civil Procedure 25(d), he is automatically substituted for Kilolo Kijakazi in this case. *See Melissa R. v. O'Malley,* No. 1:22-cv-02404-TAB-TWP, 2023 WL 8866397, at *1 n.1 (S.D. Ind. Dec. 22, 2023).

[2] The AR page numbers cited herein correspond to the ECF-generated page numbers displayed at the top center of the screen when the AR is open in ECF, rather than the page numbers printed in the lower right corner of each page.

was represented by counsel, and a vocational expert ("VE") testified. (AR 38-62). On March 16, 2022, the ALJ rendered an unfavorable decision to Brown, concluding that she was not disabled because she could perform past relevant work, in addition to a significant number of other light-exertional jobs in the national economy, despite the limitations caused by her impairments. (AR 23-31). Brown's request for review was denied by the Appeals Council (AR 6-10), at which point the ALJ's decision became the final decision of the Commissioner, *see* 20 C.F.R. § 404.981.

Brown filed a complaint with this Court on January 19, 2023, seeking relief from the Commissioner's decision. (ECF 1). In her appeal, Brown alleges that: (1) the ALJ erred in evaluating her residual functional capacity ("RFC") under SSR 85-15 and 96-8p; and (2) the ALJ's evaluation of Brown's symptoms violated SSR 16-3p and was not supported by substantial evidence. (ECF 13 at 7).

At the time of the ALJ's decision, Brown was forty-two years old (AR 29, 194, 206), had a high school education and some trade school education as an administrative assistant (AR 29, 45, 210), and had past relevant work experience as a cashier, customer service clerk, and data entry clerk (AR 29, 211). In her application, Brown alleged disability due to diabetes; vertigo; severe neuropathy; neuropathy-related pain in both hips but mainly the left hip, in both legs and feet, and in both arms and hands; and depression. (AR 209).

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation and quotation marks omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the Commissioner applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine whether substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (citations omitted). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. ANALYSIS

*A. The Law*

Under the Act, a claimant seeking DIB must establish "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed in substantial gainful activity, (2) whether she has a severe impairment, (3) whether her impairment is one that the Commissioner considers conclusively disabling, (4) whether she is incapable of performing her past relevant work, and (5) whether she is incapable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *see also* 20 C.F.R. § 404.1520.[3] "[A]n affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled." *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). "A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The Commissioner's Final Decision

On March 16, 2022, the ALJ issued a decision that ultimately became the Commissioner's final decision. (AR 23-31). As a threshold matter, the ALJ noted that Brown was insured for DIB through December 31, 2025. (AR 25). At step one, the ALJ concluded that Brown had not engaged in substantial gainful activity since August 18, 2020, her alleged onset date. (*Id.*). At step two, the ALJ found that Brown had the following severe impairments: degenerative disc disease ("DDD") of the cervical spine, diabetes, neuropathy, and obesity. (*Id.*).

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks she can do despite her limitations. 20 C.F.R §§ 404.1520(a)(4), 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. *Id.* § 404.1520(e).

At step three, the ALJ concluded that Brown did not have an impairment or combination of impairments severe enough to meet or equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 26). The ALJ then assigned Brown the following RFC:

> [T]he claimant has the [RFC] to perform the full range of light work as defined in 20 CFR 404.1567(b) except that she can frequently reach and occasionally operate foot controls. She can occasionally climb ramps and stairs, as well as occasionally stoop, kneel, crouch, and crawl. She can never climb ladders, ropes, or scaffolds, never work at unprotected heights, never work around dangerous machinery with moving mechanical parts, never operate a motor vehicle as part of her work-related duties, and never balance, as the term is defined in the [Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles].

(AR 27).

The ALJ found at step four that Brown was able to perform her past work as a data entry clerk as generally and actually performed, and as a cashier and customer service clerk as generally performed. (AR 29). Alternatively, the ALJ found that given her age, education, work experience, and RFC, Brown could perform other light-exertional jobs that exist in substantial numbers in the national economy, including inspector/packer, mail clerk, and recreation aide. (AR 30). As such, Brown's application for DIB was denied. (AR 30-31).

## C. RFC

Brown challenges the ALJ's RFC assessment, both physical and mental, on several grounds. She argues that the ALJ erred in crafting the RFC because he failed to consider medical evidence supporting leg elevation and handling restrictions, he failed to properly consider her obesity in combination with other impairments, and he failed to discuss medical evidence supporting greater limitations relating to her mental impairments.

The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning eight hours a day, for five days a week. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (bold emphasis omitted).

5

That is, the "RFC does not represent the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* (footnote omitted); *see also Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004); 20 C.F.R. § 404.1545(a)(1).

> The [RFC] assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. § 404.1545(a)(3). When determining the RFC, the ALJ must consider all medically determinable impairments, mental and physical, even those that are non-severe. 20 C.F.R. § 404.1545(a)(2); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

The ALJ penned a two-page RFC analysis summarizing a 1512-page record (AR 28-29), beginning with Brown's testimony. The ALJ relayed Brown's allegation of chronic pain in her bilateral hips, legs, feet, arms, and hands, that she shakes and jerks a lot in her hands, that she must elevate her feet/legs nearly every day, that she experiences problems sleeping at night, and that her medications cause shaking, dizziness, drowsiness, tiredness, slow reactions, slurred speech, and confusion. (AR 27). The ALJ also represented that Brown testified those symptoms affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and use her hands. (*Id.*). The ALJ concluded that Brown's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (*Id.*).

As for the medical evidence, the ALJ first noted Brown's diagnosis of diabetes mellitus with neuropathy, an EMG and nerve conduction studies supporting sensory-motor demyelinating axonal peripheral polyneuropathy involving all extremities, and imaging showing DDD and

6

spondylosis at multiple levels of her cervical spine. (AR 28). The ALJ noted Brown's body mass indexes (BMI) were consistently above 40, concluding that Brown had extreme or morbid obesity. (*Id.*). The ALJ pointed to several positive findings for moderate to severe pain with motion in Brown's cervical spine; decreased strength in her upper and lower extremities, and occasional weaker grip strength on the left; decreased sensation in her bilateral arms, legs, and/or feet; edema in her lower extremities; and ataxic, slow, and/or antalgic gait. (*Id.*).

The ALJ contrasted those positive findings with negative findings, notably that at other times, Brown had no tenderness, no tremor, and that she had normal motion in her cervical spine. (*Id.*). The ALJ explained that she frequently displayed normal musculoskeletal range of motion, normal strength, normal sensation, and a normal gait and stance. (*Id.*). He wrote that Brown also demonstrated full grip strength bilaterally with good fine finger manipulative abilities during the consultative medical examination performed by O. Villareal, M.D. (*Id.*). He pointed to the fact that she routinely had no edema in her extremities. (*Id.*). As for Brown's alleged problems sleeping and side effects from her medication, the ALJ reported that she has consistently been awake, alert, and oriented. (*Id.*). The ALJ concluded that Brown was "capable of no more than the exertional requirements of light work with additional reaching, foot control, postural, and environmental limitations." (*Id.*).

The ALJ lastly broached upon the medical opinions, concluding that the opinions of the state agency physicians and psychological consultants were persuasive and supported by the objective evidence. (*Id.*). The ALJ noted that "[a]dditional evidence was submitted after the findings of these doctors," but that it did not warrant a change in the state agency physicians' and psychological consultants' findings because Brown "continued to have functionally intact

physical and mental examinations," and because there was "no evidence" indicating her impairments or symptoms "significantly worsened." (*Id.*).

The ALJ also mentioned the opinions of the consultative psychological examiner and the consultative medical examiner, concluding that their opinions were persuasive and supported by the objective evidence of record. (AR 29). However, as for the consultative medical examiner's opinion, specifically, the ALJ stated that it was "vague" because it did not indicate "the extent to which [Brown] can sit, stand, walk, lift, carry, and handle objects." (*Id.*).

Lastly, the ALJ considered Brown's sister's third-party function report. (*Id.*). The ALJ found Brown's sister's statements to "essentially echo[]" Brown's statements and that they were "not entirely supported by the medical evidence of record." (*Id.*). The ALJ did not analyze any other evidence, stating that he "did not provide articulation about the evidence that is inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520b(c)." (*Id.*).

1. <u>Weight of Medical Opinions</u>

As a threshold matter, the Court observes that the ALJ's analysis pertaining to the weight he assigned to the cited medical opinions is rather scant. As stated, the ALJ reviewed the opinions of the state agency physicians and psychologists at the initial and reconsideration levels, the consultative psychological examiner, and the consultative medical examiner. (AR 28-29). For each medical opinion, he stated whether he found those opinions persuasive and whether they were consistent with the record. (*Id.*). But "[t]he ALJ must explain *how* he considered the consistency factor as part of his persuasiveness analysis of a medical opinion." *Shawn M. S. v. Comm'r Soc. Sec.*, No. 3:22-CV-00712-MGG, 2024 WL 1132157, at *7 (N.D. Ind. Mar. 14, 2024) (emphasis added) (citing 20 C.F.R. § 404.1520c(c)(2)). "General statements about supportability and consistency aren't enough. As other judges in this district have recognized,

general statements without further explanation are insufficient under the new regulations and require remand because they offer no logical bridge between the medical evidence and the ALJ's conclusion." *Wolford v. Kijakazi*, 658 F. Supp. 3d 664, 671 (N.D. Ind. 2023) (citations omitted); *see, e.g., Shawn M. S.*, 2024 WL 1132157, at *7 ("Courts have held general statements that a medical opinion is . . . consistent with the record are insufficient." (collecting cases)); *Willis v. Acting Comm'r Soc. Sec.*, 3:21-CV-178-JD, 2022 WL 2384031, at *4 (N.D. Ind. July 1, 2022); *Tammy M. v. Saul*, No. 2:20cv285, 2021 WL 2451907, *7-8 (N.D. Ind. June 16, 2021); *Michael L. v. Saul*, No. 2:20CV238, 2021 WL 1811736, at *11 (N.D. Ind. May 6, 2021). Here, "[t]he ALJ neither explained the rationale behind his determination nor compared [the medical] opinion[s] to any other medical or nonmedical source in the record, which is at odds[] with the legal standards for reviewing social security cases." *Shawn M.S.*, 2024 WL 1132157, at *7.[4] This failure taints the Court's ability to meaningfully review the ALJ's decision.[5]

2. <u>Leg Elevation</u>

Turning to Brown's arguments, she first takes issue with the fact that the ALJ did not include a restriction in the RFC relating to her need to elevate her legs. Specifically, she argues the ALJ erred by failing to explain why he rejected her testimony that she needs to elevate her legs. (ECF 13 at 7-8). She states the ALJ should have considered several pieces of objective medical evidence supporting this limitation. (*Id.* at 8). She specifically points to the ALJ's lack

---

[4] Beyond failing to analyze the supportability and consistency of the medical opinions cited in his decision, the ALJ also omitted to analyze several medical source opinions and failed to ascribe any weight to those opinions, as will be discussed more appropriately below.

[5] The same conclusion applies to the ALJ's analysis of Brown's sister's third-party report. SSR 16-3P, 2017 WL 5180304, at *10 (superseding SSR 96-7P) ("The [ALJ's] determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").

9

of consideration of the treatment notes of Selena Velasco, N.P., in which the nurse practitioner restricted Brown by prescribing leg elevation. (*Id.*). The Court agrees.

The ALJ acknowledged Brown's allegations of bilateral leg pain and that she must elevate her feet and legs nearly every day (AR 27), but the ALJ omitted to explain why this portion of her testimony was not consistent with the medical record. For example, the ALJ did not discuss Nurse Practitioner Velasco's treatment notes, which support Brown's testimony. Brown visited Nurse Practitioner Velasco on March 10, 2021, for, among other reasons, lower extremity pain. (AR 826-27). Nurse Practitioner Velasco's note reflects that Brown tried to treat her pain in the past with Tramadol and Gabapentin but that those medications failed to provide sufficient relief and/or were not tolerated by Brown. (AR 827). Nurse Practitioner Velasco noted Brown's reports that she had been suffering from lower extremity symptoms for three years and that her symptoms (including aching, swelling, cramping, itching, burning, and moderate to severe pain) were getting worse. (*Id.*). According to Brown, those symptoms were causing "significant difficulties with mobility [and] sleep." (*Id.*). Nurse Practitioner Velasco further explained that Brown had tried leg elevation in the past three months, a conservative measure, but that it provided minimum relief. (*Id.*). The nurse practitioner also noted that prolonged standing and smoking presented as venous risk factors. (*Id.*). She marked Brown as having chronic pain and as unstable, meaning, not yet meeting her treatment goals. (AR 828).

As for her review of Brown's physical systems, Nurse Practitioner Velasco reported bilateral lower extremity bulging and 2+ edema. (*Id.*). Under the "assessment" portion of her note, Nurse Practitioner Velasco indicated that she "prescribed conservative treatment measures . . . which includes compression stockings use (30-40mmHg), leg elevation, analgesics (anti-inflammatories), walking/exercise as tolerated, weight loss, and avoiding prolonged immobility

as much as possible." (*Id.*). She further counseled Brown "to avoid sitting or standing as much as possible and to use . . . existing pain medication regimen as needed." (*Id.*).

Brown visited Nurse Practitioner Velasco again on April 7, 2021, for lower extremity pain and other symptoms. (AR 837). She stated Brown had been "adhering to conservative care," as prescribed on March 10, 2021, but that it had "yielded partial but insufficient relief of symptoms . . . includ[ing] bilateral lower extremity aching, swelling, and diffuse pain." (AR 838). She also noted Brown was "still experiencing limitations as previously noted with household chores and sleep," and that Brown wanted "to pursue more definitive treatment." (*Id.*). She again marked Brown as having chronic pain and as unstable, meaning, not yet meeting her treatment goals. (*Id.*). Under her physical exam findings, Nurse Practitioner Velasco assessed Brown with bilateral lower extremity bulging varicosities and spider veins. (AR 839). She concluded under the "assessment" portion of her note that Brown had "tried and failed conservative care" as discussed above, and for this reason she ordered a bilateral great saphenous vein ablation with refluxing tributary sclerotherapy. (*Id.*). She also noted that Brown's obesity was a risk factor for Brown. (AR 839-40).

Despite those findings, the ALJ did not discuss Nurse Practitioner Velasco's imposition of leg elevation. While the ALJ cited Nurse Practitioner Velasco's findings regarding Brown's edema (AR 28), he "did not mention [Nurse Practitioner Velasco's] opinion in [his] decision . . . . Accordingly, the ALJ did not articulate the persuasiveness of [Nurse Practitioner Velasco's] opinion at the source level." *Evanoff v. Comm'r Soc. Sec.*, No. 2:21-CV-328 JD, 2022 WL 16737116, at *4 (N.D. Ind. Nov. 7, 2022). "As such, the ALJ's decision 'offers no clue as to

11

whether [he] *examined* the full range of medical evidence'" as it relates to Brown's allegation that she needs to elevate her legs. *Id.* (citing *Zurawski*, 245 F.3d at 888).[6]

This is all the more problematic given that Nurse Practitioner Velasco ordered that Brown elevate her leg, observed reducing weight may alleviate Brown's symptoms, and stated that Brown's obesity was a contributing factor to her leg symptoms—all points the ALJ also failed to acknowledge in his decision. *See Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014) ("Pain and numbness in the legs caused by spinal disease are bound to be aggravated by obesity."). This error was not harmless because the ALJ concluded in his RFC that Brown could perform light work, which "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).[7] A limitation relating to Brown's requirement that she elevate her leg could prevent Brown from performing light work. Therefore, the Court will remand this case on the basis that the ALJ erred by failing to consider whether Brown must elevate her leg during the workday. *See Smith v. Astrue*, 467 F. App'x 507, 510 (7th Cir. 2012) ("Given the perfunctory nature of the ALJ's discussion of leg elevation, we agree with [the claimant]. . . . The ALJ . . . did not explain *how* the records undermined [the claimant's] testimony that she needed to elevate her leg. . . . [T]here was evidence in the record that [the claimant] had to elevate her leg, including her

---

[6] Nor did the reviewing state agency physician who reviewed Nurse Practitioner Velasco's note address the nurse practitioner's instruction that Brown elevate her legs. (AR 74-75).

[7] The Court further notes that the ALJ's negative findings relating to Brown's lower extremities, notably the fact that she at times presented no edema in her extremities (*see* AR 28), are not necessarily inconsistent with Brown's need to elevate her legs. To the contrary, positive findings in other areas not mentioned by the ALJ, including findings of leg pain, spasms, swelling, numbness, and weakness, may lend additional support to Brown's allegations and the need to elevate her leg. (*See* AR 299, 301, 522-23, 525, 545, 599, 616, 620, 866, 916, 987, 989, 1016, 1025, 1027, 1150, 1202). "[A]lthough the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted); *see also John B. v. Saul*, No. 2:18-cv-00223-JVB-JEM, 2019 WL 4233744, at *2 (N.D. Ind. Sept. 5, 2019).

hearing testimony; the reports she and her husband filled out for the agency shortly after she filed her application; records from her hospital stay, which included instructions to keep the leg elevated after discharge; and records from the two follow-up appointments, at which the edema in her leg was characterized as either 'moderate' or 'severe.'").

3. Handling

Next, Brown argues that the ALJ erred when he failed to consider additional handling limitations based on (1) Brown's testimony that she could not hold items, had problems buttoning, and fastening zippers, (2) the consultative examiner's medical opinion findings regarding poor grip strength and other objective medical evidence evidencing hand pain, numbness, neuropathy, swelling, and decreased strength and/or sensation, and (3) objective evidence supporting restrictions in her handling ability such as an EMG of the upper and lower extremities and a diagnosis of demyelinating axonal peripheral polyneuropathy in all extremities. (ECF 13 at 8-10). The Court is not persuaded that this argument compels remand.

The ALJ discussed Brown's allegations that her hands shake and jerk and that she was impaired in her ability to use her hands. (AR 27). He refuted those allegations when he noted that the objective evidence revealed at times that she experienced no tremors and that she displayed good fine finger manipulative abilities during her consultative physical examination. (AR 28). He further wrote that Brown often had "normal sensation." (*Id.*).

As for grip strength, the ALJ acknowledged that she "occasionally demonstrated weaker grip strength on the left," but found that Brown demonstrated "full grip strength bilaterally" at the consultative medical examination performed by Dr. Villareal. (*Id.*). Brown contests the ALJ's reliance on Dr. Villareal's opinion because she argues Dr. Villareal's conclusion that she had full grip strength is inconsistent with his observation that Brown had a right-hand grip strength of 31

pounds of force and a left-hand grip strength of 28 pounds of force, a value she intimates corresponds to weak grip strength as it is below the mean grip strength for women of her age. (ECF 13 at 8-9; *see* AR 719). But even assuming Dr. Villareal's opinion is inconsistent with itself—and assuming the ALJ should have not relied upon it—Brown points to no other evidence imposing additional limitations pertaining to her handling ability.

As this Court has often emphasized, "the primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant." *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) (citing 20 C.F.R. § 416.912(c)). "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [her] claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)). "The ALJ needed only to include limitations in [the] RFC determination that were supported by the medical evidence and that the ALJ found to be credible." *Outlaw v. Astrue*, 412 F. App'x 894, 898 (7th Cir. 2011) (citations omitted). Here, Brown failed to carry her burden of providing any medical source opinions to support her claim that she has limitations in her handling ability. *See Gedatus v. Saul*, 994 F.3d 893, 904 (7th Cir. 2021) ("A fundamental problem is [the claimant] offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set." (citation omitted)). Therefore, even if the ALJ erred in his analysis of Dr. Villareal's opinion or in evaluating additional evidence of record, such error was harmless. In other words, Brown's allegations pertaining to her handling ability are not grounds for remand.

4. Obesity

Brown also contends the ALJ failed to adequately analyze whether her obesity, which the ALJ found to be a severe impairment at step two, impacted her RFC. (ECF 13 at 10). She argues

the ALJ should have explained the effect of her obesity on her RFC, either alone or combined with other impairments. (*Id.*). She points to her diagnosis of neuropathy, which she represents makes standing or walking extremely painful, and that the ALJ did not discuss the impact of her obesity on her ability to sit, stand, or walk for extended periods of time, or the pain the neuropathy inflicts on her spine. (*Id.* at 11). She also states that the ALJ erroneously relied on the state agency physicians because they did not find her obesity to be severe, unlike the ALJ. (*Id.*).

The ALJ found Brown's obesity to be severe at step two, though he did not elaborate why. (AR 25-26). The ALJ noted at step three that he had "considered the limiting effects of obesity" when assessing Brown's RFC and he concluded that her obesity, in conjunction with other severe impairments, did not yield a listing. (AR 26). In the RFC assessment, the ALJ only mentioned Brown's obesity when noting her BMI, which was consistently above 40. (AR 28). This was the extent of the ALJ's discussion of Brown's obesity.

"While the ALJ acknowledged that [Brown's] obesity was a severe impairment, it's not clear it entered into [his] analysis." *Michael C v. Saul*, 408 F. Supp. 3d 919, 926 (N.D. Ill. 2019). "Because the ALJ found that [Brown's] obesity significantly limited [her] ability to engage in work activity, [he] was required to discuss 'any functional limitations resulting from the obesity' when formulating [the] RFC finding." *Id.* (citing *Pepper v. Colvin*, 712 F.3d 351, 364 (7th Cir. 2013)); *see* 20 C.F.R. § 404.1520(c) (a severe impairment "significantly limits [a claimant's] physical or mental ability to engage in work activity"); (AR 25). "[A]n ALJ must consider all of the evidence and must explain [his] decision such that it may be meaningfully reviewed." *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012) (citations omitted). "If the ALJ thought that [Brown's] obesity ha[d] not resulted in [additional] limitations on her ability to work, he should

have explained how he reached that conclusion." *Id.*[8] Thus, the ALJ "determined on [his] own that obesity was a severe impairment; having done so however, [he] was obligated to consider it at all stages of [his] decision." *Patrice R.*, 2021 WL 410662, at *6.[9] Because this case will be remanded to consider Brown's need for leg elevation, the ALJ is also encouraged to explain how Brown's severe obesity impacts the RFC.

---

[8] The Commissioner argues that any omission of Brown's obesity from the ALJ's decision is harmless error because the ALJ relied on the state agency physicians, who noted Brown's weight, and the consultative physical examiner, who concluded Brown could sit, stand, walk, lift, carry, and handle. (ECF 18 at 8). However, while a lack of discussion on a claimant's obesity "may be harmless error when the ALJ's RFC finding is based on limitations identified by doctors who specifically noted obesity as a contributing factor to the exacerbation of other impairments," the state agency physicians here failed to "specifically note" whether Brown's obesity was a contributing factor to her impairments. *Michael C*, 408 F. Supp. 3d at 926 n.2 (citing *Pepper*, 712 F.3d at 365; *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006)). Contrarily to the Commissioner's representation, the state physicians at the initial and reconsideration levels did not discuss Brown's obesity beyond noting Brown's weight, nor did they address how her obesity could impact other impairments. (*See* AR 64-71, 73-81). The "state-agency physicians. . . failed to find that obesity was an impairment for [Brown]. Indeed, the physicians did not mention obesity in the notes that accompany their reports, and nothing suggests that they were even aware that [Brown] was obese." *Patrice R. v. Saul*, No. 19 C 1285, 2021 WL 410662, at *6 (N.D. Ill. Feb. 5, 2021); *see Arnett*, 676 F.3d at 593 (concluding the ALJ's error was not harmless where the state agency physician upon whom the ALJ relied "never mentioned [the claimant's] obesity diagnosis or demonstrated that she took that diagnosis into account"); *Michael L.*, 2021 WL 1811736, at *12 ("However, the state agency consultants noted Plaintiff's BMI as well as his self-reported height and weight, which was used to calculate that BMI, but neither noted that Plaintiff was obese or indicated any consideration of the effect of obesity when evaluating the evidence and offering their opinions. Clearly, the ALJ's failure to discuss the effects of obesity is not relieved by his reliance on the state agency doctors' opinions where there is no evidence those doctors considered or evaluated the effect of obesity." (citations omitted)); *Spicher v. Colvin*, No. 1:13-CV-304-TLS, 2015 WL 4714293, at *5 (N.D. Ind. Aug. 7, 2015) ("[T]he ALJ in this case relies almost exclusively on the state agency physicians . . . which, in and of themselves, are deficient in discussing the aggregate effect of the Plaintiff's obesity. . . . [T]he state agency physician in this case devotes a single line of analysis acknowledging the Plaintiff's obesity."). As for the consultative examiner, Dr. Villareal, he noted Brown's weight and BMI and concluded that Brown could sit, stand, walk, lift, carry, and handle. (AR 717-20). But the ALJ himself considered Dr. Villareal's opinion to be "vague" and "somewhat persuasive" because Dr. Villareal did not explain to what extent Brown could perform those activities. (AR 29). Therefore, it is unclear whether the ALJ relied on Dr. Villareal's conclusion in failing to ascribe limitations relating to Brown's obesity. And even to the extent the ALJ relied on Dr. Villareal's opinion, he should have "provided a thorough review of the consultative examiners' opinions and explained how he weighed such opinion[] in light of the rest of the record evidence" given his conclusion that the opinion was "vague." *Cf. Jonathan C. v. O'Malley*, No. 422-cv-00150-KMB-TWP, 2024 WL 958020, at *6 (S.D. Ind. Mar. 6, 2024) (stating that "an acknowledgment that an opinion is vague does not mean that it is inadequate or incomplete" and affirming where "the ALJ did not rely solely on vagueness in his analysis but rather provided a thorough review of the consultative examiners' opinions and explained how he weighed such opinions in light of the rest of the record evidence").

[9] In that regard, the Court could have benefitted from a more thorough RFC analysis. The ALJ must sufficiently explain his reasoning to build an "accurate and logical bridge" between the evidence of record and the RFC, *Craft*, 539 F.3d at 673 (citation omitted), but here it is unclear why the ALJ considered the state agency physicians' opinions persuasive and consistent with the record.

5. <u>Mental Impairments</u>

Lastly, Brown contends the ALJ should have included an analysis of her mental impairments in his RFC assessment. (ECF 13 at 11). She states that, although the ALJ discussed her mental impairments at step two, the ALJ should have discussed the medical record supporting mental impairments in his RFC assessment. (*Id.*). She specifically points to several opinions from the consultative psychological examiner, a licensed social worker, a psychologist,[10] a mental health counselor and other "providers," who all noted some impairments in mental health—some greater than the ALJ's findings. (*Id.* at 12).

Reading the ALJ's opinion "as a whole and with common sense" reveals the ALJ only mentioned Brown's mental impairment at step two of the five-step analysis. (AR 26); *see Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010). The ALJ first acknowledged Brown's diagnoses of adjustment disorder, anxiety, and depression. (AR 26). He also noted Brown's allegations pertaining to her bad memory, inability to focus, and her experience with irritability and anger issues. (*Id.*). The ALJ then turned to the medical record, stating that Brown often displayed a normal or appropriate mood and affect, that her memory had been normal, that she was routinely pleasant and cooperative, that she had normal and good concentration and attention, and overall normal insight and judgment. (*Id.*). He also reported Brown's function report findings, noting that she had no problems getting along with others, going out alone and shopping in stores, driving a car, and preparing simple meals. (*Id.*). The ALJ concluded that Brown had no limitations in understanding, remembering, or applying information, and in adapting or managing oneself, and that she had mild limitations in interacting with others and in concentrating, persisting, or maintaining pace. (*Id.*). The ALJ's step two

---

[10] Brown's reference to the medical opinion of a "psychologist" is understood to refer to the opinion of the medical psychological examiner. (*See* ECF 13 at 12 (citing AR 810); AR 807-13).

17

analysis yielded a finding that her mental impairments were not severe. (*Id.*). At step three, the ALJ did not discuss any of the medical evidence relating to Brown's mental impairments, nor did he impose any mental limitations in the RFC. This, too, was error.

As stated above, when determining the RFC, the ALJ must consider all medically determinable impairments, mental and physical, even those that are *non-severe*. 20 C.F.R. § 404.1545(a)(2); *see also Craft*, 539 F.3d at 676. "A failure to fully consider the impact of non-severe impairments requires reversal." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) (citation omitted). Even if the ALJ concluded that Brown's mental impairments were not severe, the ALJ still should have considered whether those impairments, in combination with Brown's other impairments, could generate greater limitations in her RFC. For example, the ALJ failed to discuss how Brown's obesity, which he found to be "severe," could impact Brown's diagnosis of depression. *See Waletzko v. Saul*, No. 3:18-CV-823 DRL, 2019 WL 6337922, at *3 (N.D. Ind. Nov. 27, 2019) ("Obesity may also cause or contribute to mental impairments such as depression." (citing SSR 02-1p, 2002 WL 34686281, at *3 (Sept. 12, 2002)).[11] The RFC analysis is devoid of any discussion of Brown's mental impairment. This compels remand.

The ALJ will be instructed to assess the medical evidence supporting Brown's allegations of mental impairments, specifically analyzing whether any medical opinions such as Dr.

---

[11] This error is particularly salient here because the medical record contains evidence supporting Brown's allegations of mental impairments. Notably, the medical evidence includes the consultative psychological examiner's (Mary Kadlec, M.D.) March 1, 2021, opinion—which the ALJ found to be persuasive—in which Dr. Kadlec found abnormal findings such as Brown's mood and behavior "suggesting" depression, anxiety, and difficulties with hyperactivity, and her conclusion that Brown had a "slight" impairment in her ability to sustain her concentration and persistence, in her judgment and common sense, and in her adaptive skill. (AR 810, 812-13). Those limitations in mental impairments were greater than those assessed by the ALJ. As stated previously, "although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Golembiewski*, 322 F.3d at 917 (citations omitted). Further, while the ALJ concluded Dr. Kadlec's opinion was persuasive and supported by the objective medical evidence, the ALJ did not explain why he failed to adopt those limitations in the step two analysis or in his RFC determination. This is yet another example of why the ALJ's lack of analysis pertaining to the medical opinions he cited prevents meaningful review by the Court.

Kadlec's opinion, support greater limitations under SSR 96-8p and ensuring that he specifies how persuasive those opinions are and whether they are consistent with the medical record. *See Cooper v. Kijakazi*, No. 20-C-1500, 2022 WL 972405, at *7 (E.D. Wis. Mar. 31, 2022); *Inmam v. Saul*, No. 1:20-CV-231 DRL, 2021 WL 4079293, at *2 (N.D. Ind. Sept. 7, 2021); 20 C.F.R. § 404.1520c(c). In doing so, the ALJ must bear in mind that he "has an obligation to evaluate every medical opinion and explain the persuasiveness of the opinion." *Hebein v. Kijakazi*, No. 3:21-CV-880-TLS-MGG, 2023 WL 2583267, at *5 (N.D. Ind. Mar. 21, 2023) (citing 20 C.F.R. §§ 416.920c(a), (b)).[12]

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's decision is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is DIRECTED to enter a judgment in favor of Brown and against the Commissioner.

SO ORDERED.

Entered this 28th day of March 2024.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[12] The Court will not discuss Brown's second argument pertaining to the ALJ's credibility assessment of her symptom testimony because this case will be remanded to the Commissioner on other grounds and because the Court already sporadically addressed this argument throughout this Opinion and Order.